# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| J. DOE,<br>c/o THE MUNDACA LAW FIRM, LLC<br>1997 Annapolis Exchange Pkwy, Suite 300<br>Annapolis, MD 21401<br><br>     *Plaintiff,*<br><br>**v.**<br><br>THE UNIVERSITY OF MARYLAND,<br>BALTIMORE,<br>Office of the Attorney General<br>Civil Litigation Division<br>200 St. Paul Place<br>Baltimore, MD 21202<br><br>     *Defendant.* | **CIVIL ACTION NO:**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, J. Doe ("J. Doe" or "Plaintiff" or "They/Them"), by and through undersigned counsel, files this Complaint against Defendant the University of Maryland, Baltimore ("UMB" or "Defendant"), to redress unlawful acts of discrimination, retaliation, and constitutional violations in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the United States Constitution, the Maryland Constitution, the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't, § 20-601 et seq. ("FEPA"), the Maryland State Personnel and Pensions Code Md. Code Ann., State Gov't § 2-301, et seq, the Maryland Equal Pay for Equal Work Law, Md. Code Ann., Lab. & Empl. § 3-301 et seq, Baltimore City Code, Art. 4(3), and Maryland common law.

As a direct result of Defendant's unlawful conduct, Plaintiff—a compliance professional, graduate student, and nonbinary individual, has suffered significant financial loss, emotional distress, reputational harm, and the deprivation of legal rights secured under federal, state, and local law. Plaintiff seeks declaratory and injunctive relief, back pay, front pay, compensatory and punitive damages, attorneys' fees, costs, and all other relief to which they are entitled under applicable law.

## NATURE OF CLAIMS

Plaintiff, a nonbinary compliance professional with nearly 20 years of experience in state and federally regulated industries, was hired on March 11, 2024, as Program Manager of Environmental Health and Safety (EHS) Projects & Compliance at UMB. Chosen over two internal candidates, Plaintiff's selection reflected their superior qualifications and expertise. Despite this, Plaintiff experienced systemic discrimination, including misgendering, exclusion from key meetings, lack of onboarding, and denial of access to restrooms aligned with their gender identity—contrary to Title VII and Maryland law. The only available gender-neutral restrooms were inaccessible or inadequate, contributing to daily distress and a hostile work environment.

Plaintiff received no orientation, clear reporting structure, performance expectations, or timely access to necessary tools and systems. Efforts to fill gaps were met with avoidance and indifference. Nevertheless, Plaintiff advanced EHS initiatives, closed compliance gaps, and delivered measurable outcomes.

Plaintiff also engaged in protected activity, reporting misconduct, racist remarks by senior officials, DEI failures, and regulatory violations to appropriate internal channels. In response,

Plaintiff was stripped of duties, excluded from communications, isolated, and ultimately targeted for termination.

On July 16, 2024—five days after their final protected disclosure—Plaintiff was notified of rejected probation and placed on a 30-day administrative work-from-home assignment. However, they were publicly escorted from the premises by armed security, and a department-wide email falsely announced their separation while they remained in an HR meeting, contradicting the assignment's terms and publicly shaming them.

Plaintiff's July 22, 2024, grievance alleged retaliation, procedural violations, and due process failures. UMB's internal grievance process ignored key facts, relied on falsehoods, and referenced altered records. These actions reflect a coordinated, retaliatory response to protected activity and violate federal, state, and local laws.

## PARTIES

1.      Defendant, the University of Maryland, Baltimore ("UMB"), is a public university and an independent governmental unit of the State of Maryland. UMB serves as the State's primary institution for public health, law, and human services, with its main campus spanning over 70 acres and encompassing dozens of buildings throughout downtown Baltimore. At all relevant times, UMB employed approximately 8,200 individuals and was an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, the Maryland Fair Employment Practices Act, the Maryland State Personnel and Pensions Code, and all other applicable local and state laws.

2.      At all times relevant to this action, Plaintiff resided within the State of Maryland and was employed by Defendant UMB, as a Program Manager of EHS Projects & Compliance from March 11, 2024, until their termination on July 16, 2024.  Plaintiff is a nonbinary individual

who uses they/them pronouns and brings this action pursuant to the protections afforded to individuals who are nonbinary or transgender under Title VII, FEPA, and related civil rights statutes.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over Plaintiff's federal claims in this action pursuant to 28 U.S.C. §1331, and 42 U.S.C. §2000e-5(f)(3), as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

4.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and the laws of the State of Maryland. Md. Code Ann. § 20-602.

5.    This Court has personal jurisdiction over Defendant because the acts and omissions alleged herein occurred within the judicial district and Defendant conducts business throughout this judicial district.

6.    Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this judicial district, and the unlawful employment practices were committed within this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.    Prior to instituting this action, on September 3, 2024, Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC Charge No. 531-2024-05311), within 300 days of the discriminatory conduct alleged herein.

8.    The EEOC issued Plaintiff a Notice of Right to Sue on April 15, 2025, more than 180 days following the filing of Plaintiff's Initial Charge.

9.      Plaintiff has satisfied all administrative prerequisites to bringing this action.

## FACTUAL ALLEGATIONS

10.      In or around May 2022, Plaintiff J. Doe made the deliberate decision to relocate from Florida to Maryland in pursuit of safety, stability, and professional opportunity. As an individual who is nonbinary, Plaintiff sought refuge in a jurisdiction widely recognized as a safe haven for LGBTQ+ communities—particularly transgender and nonbinary individuals. [1]

11.      On Plaintiff's first day of employment at the University of Maryland, and during orientation at UMB's Student Services Center, Plaintiff asked whether UMB had any plans to disband their DEI initiatives and infrastructure. Although the question sparked visible concern among fellow new hires, facilitators offered no clear or meaningful response—signaling an early disconnect between UMB's public-facing commitments and its internal climate.

12.      Shortly thereafter, Plaintiff inquired about the location of gender-neutral restroom facilities in the building. The host appeared uncomfortable and was unable to direct Plaintiff to an appropriate facility, resource or relevant policy—suggesting that even basic inclusion resources were not meaningfully integrated. Notably, this exchange occurred immediately following a presentation on diversity, equity, and inclusion. The disconnect between messaging and practice sent an early signal that UMB's public commitments to inclusivity were not meaningfully reflected in its internal operations.

---

[1] The decision followed years of escalating legislative and cultural hostility, most viscerally symbolized by the 2016 Pulse nightclub massacre in Plaintiff's own backyard of Central Florida. This decision was further solidified by the March 2024 bill where the Maryland Senate passed a bill openly declaring Maryland a sanctuary state for protecting and defending transgender individuals. The bill was passed by the Maryland House of Delegates, and the Honorable Wes Moore signed the bill into law.

13.     In pursuit of both long-term professional advancement and added legal protection amid a hostile national climate, Plaintiff enrolled in the Master of Science in Health Care Law program at the University of Maryland, Baltimore's (UMB) Francis King Carey School of Law.

Institutional Failures

14.     Just weeks after beginning their role at UMB on March 11, 2024, Plaintiff began actively researching the program. With nearly two decades of experience in compliance, regulatory affairs, and governance across multiple federally regulated sectors, Plaintiff viewed the program not only as a natural academic progression, but also as a stabilizing force capable of advancing both their personal mission and long-term professional credibility.

15.     From the outset of Plaintiff's candidacy, they demonstrated a deliberate and values-driven approach to workplace equity, institutional integrity, and ethical compliance. As a seasoned compliance professional, Plaintiff posed a series of strategic, informed questions throughout UMB's unusually lengthy and multi-phase interview and onboarding process. These inquiries focused on organizational culture, diversity infrastructure, leadership accountability, and the presence of measurable ethical standards. In response, Executive Director of Environmental Health and Safety (EHS), Dr. Sherry Bohn ("Dr. Bohn"), offered no formal policies, training frameworks, or defined performance metrics—only the vague and dismissive assurance that "for the most part people in the department are tolerant."

16.     Dr. Bohn, in an apparent attempt to appear inclusive, made unsolicited and inappropriate disclosures about an employee's presumed LGBTQ status and another's transgender child—without consent or relevance. These remarks violated workplace ethics, breached confidentiality, and showed disregard for privacy and professional standards.

17.     On or about February 20, 2024, Plaintiff received a formal offer letter from the University of Maryland, Baltimore ("UMB") for the newly created position of Program Manager of Environmental Health and Safety ("EHS") Projects & Compliance, a role housed within the Division of Administration and Finance and reporting directly to Dr. Bohn. The offer included a base salary of $87,500, a 3% cost-of-living adjustment effective July 2024, and a standard 12-month probationary period.

18.     At the time of hire, Plaintiff identified as a nonbinary individual and clearly communicated their pronouns (they/them) to all relevant parties—placing the University on clear notice of their gender identity.

19.     Shortly after receiving the offer, Dr. Bohn contacted Plaintiff to discuss compensation. Plaintiff expressed that, based on the role's scope, their extensive compliance experience across federally regulated industries, and compensation benchmarks for similar positions, a salary range of $97,000 to $100,000 would be appropriate. Dr. Bohn responded that she would advocate to Human Resources for $93,000—a move that implicitly acknowledged the inadequacy of the initial offer. UMB ultimately extended an offer for $90,000—still below Plaintiff's request and demonstrably below salaries for individuals in comparable, similarly situated roles within the department, as documented by Plaintiff using Maryland Public Information Act records.[2] Plaintiff subsequently accepted UMB's offer.

20.     On March 11, 2024, Plaintiff commenced employment with UMB and within the EHS Department.

21.     During early onboarding, Plaintiff requested to be stationed within the EHS building—citing two critical reasons: (1) proximity to the operational staff they were hired to

---

[2] MPIA records indicate that colleagues on the same organization level (all cisgendered men) were compensated with an annual salary in excess of $100,000.00 per year.

support, and (2) timely, safe and dignified access to one of the building's few gender-neutral restrooms. This dual rationale—anchored in operational efficiency, professional dignity, and psychological safety—was not merely a preference, but a strategic and essential requirement, rooted in Plaintiff's nonbinary identity and protected workplace needs. Nevertheless, Dr. Bohn unilaterally assigned Plaintiff to an isolated third-floor executive suite adjacent to her own—an area disconnected from key operations staff and devoid of inclusive facilities.

22.     Dr. Bohn's justification for placing Plaintiff on the third floor—"supervisory proximity"—was a thin pretext. In practice, Bohn was frequently absent and disengaged, providing no direct supervision or oversight. Her decision effectively functioned as administrative segregation—physically and symbolically isolating Plaintiff from their team, essential workflows, and identity-affirming facilities. This isolation had the predictable effect to undermine Plaintiff's role, compromise their psychological safety, and violate their civil rights from day one.

23.     UMB, through the absentee leadership of Dr. Bohn, made no effort to formally integrate Plaintiff into the team, clarify the scope of their responsibilities, or affirm their legitimacy within the department. As a result, staff expressed routine confusion about Plaintiff's presence and role. The complete absence of structured onboarding and institutional support deprived Plaintiff of the tools, access, and recognition necessary to succeed.

24.     This lack of support was compounded by Dr. Bohn's extended absences: a two-week "business trip" to Europe in early May 2024, followed immediately by a month-long personal vacation. Colleagues frequently remarked on her chronic unavailability. During this period, Plaintiff attempted to report a workplace harassment incident. In response, Dr. Bohn texted a photo of a Manhattan cocktail and stated she had "had a few" and would be unavailable the next day—trivializing Plaintiff's concern and failing to fulfill her supervisory and institutional obligations.

25.     On May 30, 2024, Plaintiff emailed Dr. Bohn and Dr. Matthew Fischer, Assistant Director of EHS ("Dr. Fischer"), to formally request clarification of their role and to raise concerns about the lack of integration and oversight. While Bohn initially responded with an apology, acknowledgment of her being unprepared, and with what appeared to be concern, she later adopted an adversarial tone during a June 10, 2024, meeting—marking a sharp shift in tone and triggering Plaintiff's decision to contact UMB's Ombuds Office.

Explicit Gender Identity Discrimination

26.     Within the first week of employment, Plaintiff began experiencing discriminatory treatment related to bathroom access. Assigned to the third-floor executive suite—where no gender-affirming restroom was available—Plaintiff was forced to navigate to other floors to meet their basic needs. These movements, rather than being discreet or supported, became a source of public scrutiny and mockery. Then–Assistant Biosafety Officer Simone Houng ("Houng") characterized Plaintiff's restroom trips as the "walk of shame," ridiculing what should have been a private and protected accommodation. With an air of false humor, Houng remarked, "The only reason we know you're down there is to use the bathroom," embedding surveillance and derision into a basic act of bodily autonomy. She added, "I've never worked with one of you before," reducing Plaintiff's nonbinary identity to novelty and tokenism—treating their presence as both unfamiliar and symbolic rather than dignified and integrated

27.     The phrase "walk of shame," coined by Houng, became a recurring form of linguistic harassment, weaponized to monitor and marginalize Plaintiff's basic restroom use. This pattern of mockery was allowed to take root due to leadership's failure to intervene. Plaintiff raised these concerns in a March 18, 2024, meeting with Assistant Director Dr. Matthew Fischer and again via text on March 19, 2024, to Dr. Bohn. Despite this notice, no corrective action was taken.

Dr. Fischer—whom Houng had implicitly dismissed as irrelevant—remained silent, thereby enabling the misconduct to continue unchecked.

28.     During later grievance proceedings, Dr. Bohn astonishingly submitted a floor plan to suggest that Plaintiff could have avoided harassment by choosing "alternative routes" to restrooms. This response failed to acknowledge that the initial harm stemmed not from Plaintiff's route, but from the lack of access to an inclusive restroom near their assigned workspace—a structural deficiency UMB never addressed. Moreover, the proposed "routes" did nothing to address the core issue: leadership's refusal to confront or correct the behavior of colleagues who weaponized restroom access to harass and alienate Plaintiff. The suggestion that Plaintiff alone bore responsibility for avoiding mistreatment reflects a culture of blame-shifting, rather than accountability.

29.     The consequences of Plaintiff's restroom placement culminated in a discriminatory incident. In late March/Early April, after back-to-back meetings that left insufficient time to travel to other floors, Plaintiff briefly used the third-floor women's restroom, assuming the area was unoccupied due to most staff working remotely. They were confronted by administrative analyst, Antoinette Shannon,[3] who remarked, "It's okay, we can use the same bathroom as long as we have the same body parts."

30.     The consequences of UMB's failure to provide accessible, inclusive facilities culminated in a further discriminatory incident. In late March or early April 2024, after back-to-back meetings left Plaintiff without adequate time to travel between floors, they briefly used the third-floor women's restroom, assuming it was unoccupied due to most staff working remotely. Plaintiff was then confronted by administrative analyst Antoinette Shannon, who remarked, "It's

---

[3] At that time, Antoinette Shannon reported directly to Jonathan Bratt.

okay, we can use the same bathroom as long as we have the same body parts." This invasive comment policed Plaintiff's body and identity, adding to a pattern of gender-based hostility and humiliation.

<u>Failure to Mitigate Discrimination and An Increase in Retaliatory Hostility</u>

31.    Plaintiff immediately reported the incident to Dr. Fischer, who casually dismissed the complaint, saying, "Hopefully the bathrooms get remodeled soon."[4] When the matter was raised with Dr. Bohn, she responded by rolling her eyes and laughing—minimizing the harm and reinforcing a culture of institutional indifference to transphobic behavior.

32.    Plaintiff immediately reported the incident to Dr. Fischer, who casually dismissed the complaint with, "Hopefully the bathrooms get remodeled soon." When raised with Dr. Bohn, she rolled her eyes and laughed, visibly minimizing the harm. These responses reflected a deep institutional indifference to Plaintiff's civil rights and reinforced a culture in which transphobic remarks were not only tolerated but trivialized by leadership.

33.    Following Plaintiff's initial reports of discriminatory treatment, including transphobic remarks and inequitable bathroom access, Defendants engaged in a sustained and targeted campaign of retaliation. Plaintiff was systematically excluded from essential meetings, denied timely access to critical systems and resources, and subjected to a pattern of delayed or withheld information necessary to fulfill their job duties. Scheduled one-on-one supervisory meetings were frequently canceled without explanation, further obstructing communication, feedback, and accountability.

---

[4] Upon information and belief, two of the four gender-neutral restrooms were merely repurposed men's rooms that still contained urinals.

34.    Dr. Bohn and Dr. Fischer each played distinct but complementary roles in orchestrating and enabling the retaliatory environment. Initially, Plaintiff believed Dr. Bohn was acting in good faith.

35.    However, by mid-May, Dr. Bohn's demeanor shifted markedly—coinciding with what appeared to be her realization of the institution's potential legal exposure. Her conduct became increasingly adversarial and calculated, marked by manipulation of department narratives, selective dissemination of information, and active misrepresentation of Plaintiff's conduct and performance. Rather than addressing the underlying workplace issues, Dr. Bohn's actions focused on shielding departmental leadership from scrutiny. Her behavior reflected classic gaslighting: initially feigning allyship before flipping to weaponize that trust against Plaintiff. Her conduct was performative, image-driven, and intent on reasserting control over narratives and perception rather than substance.

36.    Dr. Fischer's role, though less overt, was equally harmful. While he initially enlisted Plaintiff's assistance in navigating departmental dysfunction, he quickly receded into passivity and refused to intervene when Plaintiff faced exclusionary or discriminatory conduct. Though he privately acknowledged concerns about certain team members, he failed to take any meaningful action. Over time, it became clear that Dr. Fischer had concealed his complicity behind a façade of neutrality—avoiding conflict, stonewalling communication, and enabling misconduct through silence. He operated as a conniving sidekick—duplicitous, weak-willed, and transactional in his alliances. While Dr. Bohn distorted reality to protect leadership optics, Dr. Fischer allowed harm to fester under the guise of professionalism.

37.    On April 25, 2024, Plaintiff sent a text message to Dr. Bohn, who was attending a conference in Cleveland, formally reporting psychological harassment and targeted exclusion by

colleagues Shakiara Seals and Antoinette Shannon. The retaliation appeared to escalate after Plaintiff attempted to address a personnel operations issue involving the Radiation Lab.

38.    Instead of acknowledging the seriousness of the complaint or offering any form of support or intervention, Dr. Bohn responded with a photograph of a cocktail and a dismissive remark—an unprofessional and tone-deaf reaction that trivialized Plaintiff's experience and demonstrated a fundamental disregard for their safety, dignity, and legal protections.

39.    Dr. Bohn then instructed Plaintiff to draft an email to "clear the air" with the same individuals who had engaged in exclusionary conduct, thereby placing the burden of resolution on the complainant. This not only undermined Plaintiff's credibility but also reinforced a retaliatory and inequitable approach to workplace conflict.

40.    Despite the lack of institutional support, Plaintiff complied in good faith, composing a thoughtful and emotionally intelligent message in an effort to de-escalate the situation and preserve professional relationships. Plaintiff's actions were consistent with a desire to improve team dynamics, not provoke discord.

41.    However, Defendants continued to distort facts, failed to take corrective action, and deepened Plaintiff's isolation through selective communication, exclusion from key workflows, and intentional withholding of necessary information. Heightened scrutiny, inconsistent performance expectations, and disparate accountability standards were imposed on Plaintiff—discriminatory patterns not observed among employees outside of Plaintiff's protected class—demonstrating a sustained retaliatory campaign that further entrenched the hostile work environment.

42.    On May 29, 2024, Plaintiff attended a meeting with Dr. Bohn and Dr. Fischer, during which both supervisors made racially discriminatory remarks, referring to Black women in

the department, particularly Shannon and Seals as "stray dogs that bite." This deeply offensive characterization shocked and disturbed Plaintiff, who immediately recognized the comment as dehumanizing and steeped in racial bias.

43.     The meeting's hostile tenor and the shock of hearing such overtly discriminatory language left Plaintiff visibly shaken. Upon leaving Dr. Bohn's office, Plaintiff dropped items they were holding, a physical manifestation of emotional distress and psychological disorientation triggered by the meeting's events.

44.     Plaintiff's decision to complete the remainder of the May 29, 2024, workday remotely was prompted by the emotionally destabilizing nature of the meeting and the need to reestablish psychological safety. From their office, Plaintiff sent a Microsoft Teams message to Dr. Bohn—consistent with prior communication practices—notifying her of their intent to work remotely. This decision allowed Plaintiff to collect themselves, manage emotional distress, and begin drafting a professional and measured request for role clarification.

45.     On May 30, 2024, Plaintiff sent an email to Dr. Bohn formally requesting a meeting to address the persistent ambiguity surrounding their duties and to clarify their scope of responsibilities. Dr. Bohn responded by partially clarifying expectations and, notably, admitted that she had been unprepared for Plaintiff's arrival in the newly created role. Her acknowledgment underscored the systemic failures in onboarding and leadership readiness.

46.     On May 31, 2024, Plaintiff escalated their concerns by submitting a formal email detailing ongoing issues of ethical lapses, discrimination, and departmental dysfunction—particularly involving Dr. Fischer. The email called for immediate attention to deteriorating conditions within the department and expressed growing alarm over violations of policy and professional standards.

47.     In this correspondence, Plaintiff specifically cited concerns about UMB's "Policy on the Protection of Minors" in relation to a university-led summer internship program. Plaintiff had observed troubling deviations from established safety protocols and professional boundaries, including inappropriate lab access for minors. These observations were cited as emblematic of the department's broader failures in oversight and ethics.

48.     This escalation followed several prior, unaddressed requests for role clarity and supervisory engagement. The pattern of delayed or vague responses reinforced Plaintiff's growing sense of institutional exclusion and retaliation. The failure to provide clarity or support contributed directly to the erosion of Plaintiff's ability to fulfill their duties and fostered an environment of heightened psychological distress and professional uncertainty.

49.     On June 10, 2024, in response to Plaintiff's email requesting clarification regarding role ambiguity, ethical concerns, and patterns of discrimination, Plaintiff attended a meeting with Dr. Bohn and Dr. Fischer. Although Plaintiff had initiated the request in good faith as a clarification meeting, the session quickly devolved into a hostile ambush. Rather than providing clarity or accountability, Dr. Bohn and Dr. Fischer used the meeting to undermine Plaintiff, dismissing their documented concerns and attributing systemic failures to Plaintiff's conduct and communication style.

50.     During this meeting, Plaintiff was presented with a newly fabricated "Roles and Responsibilities" document that significantly expanded the scope of their position beyond the original Program Manager role. The document lacked key performance indicators (KPIs), authority, onboarding, or prior discussion, and appeared to be created retroactively to justify a shifting performance narrative.

51.    After the meeting, Plaintiff consulted with Radiation Safety Officer Ed Case, a knowledgeable colleague who had firsthand knowledge of Plaintiff's actual contributions. Mr. Case reviewed the newly issued "Roles and Responsibilities" document and expressed concern about its content, noting that many items had never been discussed or assigned.

52.    On June 11, 2024, alarmed by the escalating hostility and lack of institutional safeguards, Plaintiff formally contacted the University Ombudsman to report ongoing harassment, retaliation, and psychological safety violations. This marked the beginning of formal protected activity.

53.    In an email titled "Request for Assistance with Retaliation and Harassment," Plaintiff described the deteriorating work environment and requested a facilitated conversation with supervisors to address the harm and avoid further escalation.

54.    The next day, June 12, 2024, Plaintiff sent formal Outlook invitations to Dr. Bohn and Dr. Fischer to attend an Ombuds-led meeting. This action reflected Plaintiff's continued attempt to resolve conflict through collaborative, institutional channels.

55.    Almost immediately sending the invites, the retaliation worsened. Dr. Fischer began avoiding Plaintiff entirely—closing his door, and excluding Plaintiff from key team meetings and hiring panels. Plaintiff submitted a second complaint to the Ombudsman documenting this escalating retaliatory conduct.

56.    On June 24, 2024, Assistant Vice President Jonathan Bratt replied to Plaintiff with vague and dismissive language, claiming he had not heard from the Ombudsman and "did not expect to." This response functionally denied Plaintiff access to internal resolution processes.

57.    From late June through early July 2024, Plaintiff experienced intensified retaliation for engaging in protected activity. This included excessive scrutiny, the stripping of

responsibilities, persistent bathroom-related harassment, and increasing exclusion from departmental communications.

58.    On July 11, 2024, Plaintiff attended a final meeting with the Ombudsman in a last attempt to mediate and remedy the ongoing discrimination. However, the meeting yielded no solutions, and Plaintiff was met with dismissiveness and further marginalization.

59.    On July 16, 2024—just five days after the Ombudsman meeting—Defendant abruptly terminated Plaintiff. Dr. Bohn informed Plaintiff, "I do not have to tell you [the reason] because you are under probation," and added, "you are leaving this building today and not coming back."[5] This statement, paired with the immediate revocation of access and removal by security, underscored the retaliatory intent behind the dismissal.

60.    Though the termination was made effective August 16, 2024, Plaintiff was barred from returning to work the same day, July 16—demonstrating a pretextual delay and reinforcing the retaliatory nature of the action.

61.    During their tenure, Plaintiff was tokenized due to their gender identity, excluded from advancement opportunities, and subjected to repeated humiliation and harassment regarding restroom access and bodily privacy. These incidents were neither accidental nor isolated—they formed a pattern of bias grounded in Plaintiff's protected status.

62.    Notably, at no point during Plaintiff's employment did Defendants issue formal warnings, documentation, or a Performance Improvement Plan (PIP). Post-hoc references to "performance" were fabricated to obscure the discriminatory and retaliatory nature of Plaintiff's termination.

## CLAIMS FOR RELIEF

---

[5] It was not until UMDB filed its Position Statement at the EEOC that "performance" was listed as the reason for termination.

## COUNT I
## DISCRIMINATION BASED ON GENDER IDENTITY IN VIOLATION OF TITLE VII
### [42 U.S.C. § 2000e, *et seq.*]

63.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

64.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, prohibits discrimination on the basis of sex, including gender identity, with respect to any aspect of employment, including hiring, firing, pay, job assignments, promotions, and any other terms or conditions of employment.

65.     At all relevant times, Defendant UMB was an "employer" within the meaning of Title VII, and Plaintiff was an "employee" within the meaning of Title VII.

66.     Plaintiff is a non-binary/transgender individual who uses they/them pronouns.

67.     Defendant subjected Plaintiff to ongoing discriminatory practices based on their gender identity, including but not limited to:

      a.     Restricting and denying appropriate bathroom access;

      b.     Making discriminatory comments about Plaintiff's bathroom use;

      c.     Denying office relocation requests that would provide appropriate facility access;

      d.     Systematically excluding Plaintiff from meetings and communications;

      e.     Withholding necessary information and resources;

      f.     Subjecting Plaintiff to heightened scrutiny and standards; and

      g.     Tokenizing Plaintiff's gender identity without consent.

68.     Similarly situated cisgender employees were not subjected to the same discriminatory treatment, restrictions, or hostile conditions regarding facilities access and workplace participation.

69.     Defendant's discriminatory actions culminated in Plaintiff's termination on July 16, 2024, just five days after their final meeting with the University Ombudsman regarding their discrimination complaints.

70.     By the acts and omissions alleged above, Defendant, in violation of 42 U.S.C. § 2000e-2, intentionally deprived Plaintiff of equal employment opportunities and otherwise adversely affected their status as an employee.

71.     As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages and salary; lost employment benefits, including tuition remission; lost health insurance; lost dental insurance; lost vision insurance; emotional distress; loss of career opportunities; and other compensable damages to be proven at trial.

72.     As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

**COUNT II**
**RETALIATION IN VIOLATION OF TITLE VII**
**[42 U.S.C. § 2000e-3(a)]**

73.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

74.     Title VII prohibits employers from retaliating against employees who engage in protected activities, including opposing discriminatory practices or making complaints about discrimination.

75.     Plaintiff engaged in protected activities when they:

    a.      Reported harassment regarding bathroom access in March/April 2024;

b.     Sent a formal text message reporting harassment to Dr. Bohn on April 25, 2024;

c.     Raised concerns about departmental integrity on May 31, 2024;

d.     Filed a formal complaint with the University Ombudsman on June 11, 2024; and

e.     Participated in Ombudsman meetings regarding their discrimination complaints through July 11, 2024.

76.     In response to Plaintiff's protected activities, Defendant took adverse employment actions against Plaintiff, including:

a)     Increased scrutiny of their work performance;

b)     Further exclusion from meetings and communications;

c)     Cancellation of scheduled meetings;

d)     Withholding of necessary resources and information; and

e)     Termination of employment on July 16, 2024.

77.     The temporal proximity between Plaintiff's protected activities and Defendant's adverse actions, particularly their termination just five days after their final Ombudsman meeting, demonstrates a causal connection between the protected activities and the retaliation.

78.     Defendant has no legitimate, non-retaliatory reason for their adverse actions against Plaintiff.

79.     By the acts and omissions alleged above, Defendant violated 42 U.S.C. § 2000e-3(a) by retaliating against Plaintiff for engaging in protected activities.

80.     As a direct, proximate, and foreseeable result of Defendant's unlawful retaliation, Plaintiff has suffered and will continue to suffer damages as set forth above.

## COUNT III
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII
### [42 U.S.C. § 2000e, et seq.]

81.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

82.    Defendant's discriminatory conduct was sufficiently severe and pervasive to create a hostile work environment that altered the conditions of Plaintiff's employment.

83.    The hostile work environment included, but was not limited to:

    a.    Persistent harassment regarding bathroom access;

    b.    Derogatory comments about Plaintiff's gender identity;

    c.    Systematic exclusion from professional opportunities;

    d.    Denial of necessary resources and support;

    e.    Heightened scrutiny of work performance;

    f.    Frequent cancellation of meetings;

    g.    Withholding of important information; and

    h.    Tokenization of Plaintiff's gender identity.

84.    Plaintiff reported the hostile work environment to various supervisors and the University Ombudsman, but Defendant failed to take appropriate corrective action.

85.    Instead, Defendant's harassment escalated following Plaintiff's complaints, creating an increasingly hostile environment that culminated in their termination.

86.    By the acts and omissions alleged above, Defendant violated Title VII by subjecting Plaintiff to a hostile work environment based on their gender identity.

87.     As a direct, proximate, and foreseeable result of Defendant's creation and maintenance of a hostile work environment, Plaintiff has suffered and will continue to suffer damages as set forth above.

## COUNT IV
## DISCRIMINATION IN VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT
### [Md. Code Ann., State Gov't § 20-601 *et seq*.]

88.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

89.     The Maryland Fair Employment Practices Act prohibits discrimination in employment based on gender identity and prohibits retaliation against individuals who oppose discriminatory practices.

90.     Defendant's discriminatory conduct, as detailed above, violated the Maryland Fair Employment Practices Act by:

    a.      Discriminating against Plaintiff based on their gender identity;

    b.      Creating and maintaining a hostile work environment;

    c.      Retaliating against Plaintiff for opposing discriminatory practices; and

    d.      Terminating Plaintiff's employment.

91.     As a direct, proximate, and foreseeable result of Defendant's violations of the Maryland Fair Employment Practices Act, Plaintiff has suffered and will continue to suffer damages as set forth above.

## COUNT V
## VIOLATION OF MARYLAND STATE PERSONNEL AND PENSIONS CODE
### [Md. Code Ann., State Pers. & Pens. § 2-301, *et seq*]

92.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

93.     The Maryland State Personnel and Pensions Code prohibits discrimination in State employment based on gender identity and prohibits retaliation against employees who oppose discriminatory practices.

94.     Defendants' conduct, as detailed above, violated § 2-301, *et seq* by:

      a.      Discriminating against Plaintiff in the terms and conditions of employment based on their gender identity;

      b.      Creating and maintaining a hostile work environment;

      c.      Retaliating against Plaintiff for opposing discriminatory practices; and

      d.      Terminating Plaintiff's employment.

95.     As a direct, proximate, and foreseeable result of Defendants' violations of § 2-302, Plaintiff has suffered and will continue to suffer damages as set forth above.

## COUNT VI
### VIOLATION OF MARYLAND EQUAL PAY FOR EQUALWORK LAW
### [Md. Code Ann., Lab. & Empl. § 3-301 *et seq*]

96.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

97.     The Maryland Equal Pay for Equal Work law prohibits providing less favorable employment opportunities, based on gender identity.

98.     The law also prohibits paying a lower wage to an employee for comparable work to that of other employees with a higher wage.

99.      Despite possessing nearly two decades of compliance experience, Plaintiff was offered an initial salary of $87,500.00 to fill their position.

100.    Based on their extensive qualifications and market research, Plaintiff requested compensation in the range of $97,000-$100,000, which represented appropriate compensation for their experience level and the position's scope.

101.    Dr. Bohn's response that she would advocate for $93,000.00 was tacit acknowledgment of the inadequacy of the initial offer.

102.    The final offer of $90,000 was demonstrably below salaries for individuals in comparable roles within the department.

103.    As Program Manager of EHS Projects & Compliance, Plaintiff performed work substantially similar to other management-level positions within the EHS department, requiring comparable skill, effort, responsibility, and working conditions.

104.    No legitimate business factors justified the below-market compensation given Plaintiff's extensive qualifications and demonstrated superior performance.

105.    The compensation disparity resulted in an immediate loss of no less than $10,000.00 per year.

106.    Pro-rated for the employment period of approximately four months represents an immediate loss of no less than $3,333.33 in actual wages.

107.    The artificially depressed starting salary would have affected all future merit increases and cost-of-living adjustments, compounding the future financial harm.

108.    Under the Maryland Equal Pay for Equal Work Law, Plaintiff is entitled to liquidated damages equal to the back pay amount, effectively doubling the recovery for the compensation discrimination.

**COUNT VII**
**VIOLATION OF THE UNITED STATES CONSTITUTION**
**[US Const. Amend. XIV]**

109.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

110.    The Fourteenth Amendment of the United States Constitution states that no State "shall deprive any person of life, liberty, or *property*, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added).

111.    UMB is a public university and independent governmental unit of the State of Maryland, making it a state actor subject to 14th Amendment constraints. Defendants Dr. Bohn, Dr. Fischer, and Jonathan Bratt acted under color of state law as state employees.

112.    Plaintiff is a non-binary/transgender individual who uses they/them pronouns.

113.    Defendant subjected Plaintiff to ongoing discriminatory practices based on their gender identity, including but not limited to:

      a.      Restricting and denying appropriate bathroom access;

      b.      Making discriminatory comments about Plaintiff's bathroom use;

      c.      Denying office relocation requests that would provide appropriate facility access;

      d.      Systematically excluding Plaintiff from meetings and communications;

      e.      Withholding necessary information and resources;

      f.      Subjecting Plaintiff to heightened scrutiny and standards; and

      g.      Tokenizing Plaintiff's gender identity without consent.

114.    Similarly situated cisgender employees were not subjected to the same discriminatory treatment, restrictions, or hostile conditions regarding facilities access and workplace participation.

115.    Defendant's discriminatory actions culminated in Plaintiff's termination on July 16, 2024, just five days after their final meeting with the University Ombudsman regarding their discrimination complaints.

116.    By the acts and omissions alleged above, Defendant, in violation of the Fourteenth Amendment of the United States Constitution, intentionally deprived Plaintiff of their substantive and due process rights.

117.    As a probationary state employee, Plaintiff had a constitutionally protected liberty interest in their reputation and future employment opportunities to not be discriminated based on their protected class.

118.    Defendants engaged in arbitrary and capricious actions when it:

a.    Plaintiff was terminated without any formal disciplinary actions or Performance Improvement Plans, despite other employees with documented performance issues receiving such opportunities;

b.    The termination occurred just 5 days after Plaintiff's final Ombudsman meeting, demonstrating arbitrary timing; and

c.    UMB failed to follow its own policies regarding discrimination reporting and investigation.

119.    Defendants deprived Plaintiff of adequate process in their termination, including:

a.    Plaintiff was not given any meaningful opportunity to respond to alleged performance concerns before termination;

b.    Defendant failed to follow formal disciplinary procedures despite established grievance policies, such as when Bratt indicated that there would be no engagement with the Ombuds Office investigation;

c.    Plaintiff's termination was carried out in a humiliating manner with armed security escort, damaging their reputation.

120.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages and salary; lost employment benefits, including tuition remission; lost health insurance; lost dental insurance; lost vision insurance; emotional distress; loss of career opportunities; and other compensable damages to be proven at trial.

121.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## COUNT VIII
## VIOLATION OF MARYLAND EQUAL RIGHTS AMENDMENT
### [Md. Const. Decl. of Rts., Art. XXIV]

122.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

123.    Article XXIV of the Maryland Constitution states that "no [person] ought to be . . . deprived of [their] life, liberty, *or property*, but by the judgment of [their] peers, or by the Law of the land." (emphasis added).

124.    UMB is a public university and independent governmental unit of the State of Maryland, making it a state actor subject to 24th Amendment constraints. Defendants Dr. Bohn, Dr. Fischer, and Jonathan Bratt acted under color of state law as state employees.

125.    Plaintiff is a non-binary/transgender individual who uses they/them pronouns.

126.    Defendant subjected Plaintiff to ongoing discriminatory practices based on their gender identity, including but not limited to:

      h.    Restricting and denying appropriate bathroom access;

      i.    Making discriminatory comments about Plaintiff's bathroom use;

      j.    Denying office relocation requests that would provide appropriate facility access;

k.    Systematically excluding Plaintiff from meetings and communications;

l.    Withholding necessary information and resources;

m.    Subjecting Plaintiff to heightened scrutiny and standards; and

n.    Tokenizing Plaintiff's gender identity without consent.

127.    Similarly situated cisgender employees were not subjected to the same discriminatory treatment, restrictions, or hostile conditions regarding facilities access and workplace participation.

128.    Defendant's discriminatory actions culminated in Plaintiff's termination on July 16, 2024, just five days after their final meeting with the University Ombudsman regarding their discrimination complaints.

129.    By the acts and omissions alleged above, Defendant, in violation of Article XXIV of the Maryland Constitution, intentionally deprived Plaintiff of their substantive and due process rights.

130.    As a probationary state employee, Plaintiff had a constitutionally protected liberty interest in their reputation and future employment opportunities to not be discriminated based on their protected class.

131.    Defendants engaged in arbitrary and capricious actions when it:

a.    Plaintiff was terminated without any formal disciplinary actions or Performance Improvement Plans, despite other employees with documented performance issues receiving such opportunities;

b.    The termination occurred just 5 days after Plaintiff's final Ombudsman meeting, demonstrating arbitrary timing; and

c.    UMB failed to follow its own policies regarding discrimination reporting and investigation.

132.     Defendants deprived Plaintiff of adequate process in their termination, including:

a.     Plaintiff was not given any meaningful opportunity to respond to alleged performance concerns before termination;

b.     Defendant failed to follow formal disciplinary procedures despite established grievance policies, such as when Bratt indicated that there would be no engagement with the Ombuds Office investigation;

c.     Plaintiff's termination was carried out in a humiliating manner with armed security escort, damaging their reputation.

133.     As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages and salary; lost employment benefits, including tuition remission; lost health insurance; lost dental insurance; lost vision insurance; emotional distress; loss of career opportunities; and other compensable damages to be proven at trial.

134.     As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## COUNT IX
## VIOLATION OF MARYLAND EQUAL RIGHTS AMENDMENT
### [Md. Const. Decl. of Rts., Art. XLVI]

135.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

136.     Article XLVI of the Maryland Constitution states that the "equality of rights under the law shall not be abridged or denied because of sex."

137.     Defendants acted under color of state law as employees of a public university and independent governmental unit of the State of Maryland.

138.    Plaintiff is a non-binary/transgender individual who uses they/them pronouns.

139.    Defendant subjected Plaintiff to ongoing discriminatory practices based on their gender identity, including but not limited to:

      a.    Restricting and denying appropriate bathroom access;

      b.    Making discriminatory comments about Plaintiff's bathroom use;

      c.    Denying office relocation requests that would provide appropriate facility access;

      d.    Systematically excluding Plaintiff from meetings and communications;

      e.    Withholding necessary information and resources;

      f.    Subjecting Plaintiff to heightened scrutiny and standards; and

      g.    Tokenizing Plaintiff's gender identity without consent.

140.    Similarly situated cisgender employees were not subjected to the same discriminatory treatment, restrictions, or hostile conditions regarding facilities access and workplace participation.

141.    Defendant's discriminatory actions culminated in Plaintiff's termination on July 16, 2024, just five days after their final meeting with the University Ombudsman regarding their discrimination complaints.

142.    By the acts and omissions alleged above, Defendant, in violation of Article XLVI of the Maryland Constitution, intentionally deprived Plaintiff of equal employment opportunities and otherwise adversely affected their status as an employee.

143.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages and salary; lost employment benefits, including tuition remission; lost health insurance; lost dental insurance; lost vision insurance; emotional distress; loss of career opportunities; and other compensable damages to be proven at trial.

144.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

**COUNT X**
**VIOLATION OF BALTIMORE CITY CODE**
**Article IV, Subtitle III**

145.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

146.    At all relevant times, Defendant UMB was an "employer" within the meaning of the Baltimore City Code.

147.    Baltimore City Code makes it unlawful for an employer within the city to "discriminate against an individual with respect to hire, tenure, promotion, terms, conditions, or privileges of employment or any matter directly or indirectly related to employment" on the basis of that individual's "sex . . . sexual orientation [or] gender identity or expression.

148.    Plaintiff is a non-binary/transgender individual who uses they/them pronouns.

149.    Defendant subjected Plaintiff to ongoing discriminatory practices based on their gender identity, including but not limited to:

   a.    Restricting and denying appropriate bathroom access;

   b.    Making discriminatory comments about Plaintiff's bathroom use;

   c.    Denying office relocation requests that would provide appropriate facility access;

   d.    Systematically excluding Plaintiff from meetings and communications;

   e.    Withholding necessary information and resources;

   f.    Subjecting Plaintiff to heightened scrutiny and standards; and

   g.    Tokenizing Plaintiff's gender identity without consent.

150.    Similarly situated cisgender employees were not subjected to the same discriminatory treatment, restrictions, or hostile conditions regarding facilities access and workplace participation.

151.    Defendant's discriminatory actions culminated in Plaintiff's termination on July 16, 2024, just five days after their final meeting with the University Ombudsman regarding their discrimination complaints.

152.    By the acts and omissions alleged above, Defendant, in violation of Baltimore City Code, Art. IV, subtit. III, intentionally deprived Plaintiff of equal employment opportunities and otherwise adversely affected their status as an employee.

153.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages and salary; lost employment benefits, including tuition remission; lost health insurance; lost dental insurance; lost vision insurance; emotional distress; loss of career opportunities; and other compensable damages to be proven at trial.

154.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff J. Doe respectfully requests that this Court enter judgment in their favor and against Defendants, and grant the following relief:

1)    Declare that the acts and practices complained of herein are violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the United States Constitution, the Maryland Constitution, the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't, § 20-601 *et seq.* ("FEPA"), the Maryland State Personnel and Pensions Code

Md. Code Ann., State Gov't § 2-301, *et seq*, the Maryland Equal Pay for Equal Work Law, Md. Code Ann., Lab. & Empl. § 3-301 *et seq*, Baltimore City Code, Art. 4(3), and Maryland common law;

2)      Enter a permanent injunction directing Defendants to cease and desist from engaging in discriminatory practices based on gender identity and to implement appropriate policies and training to prevent future discrimination;

3)      Order Defendants to reinstate Plaintiff to their former position, or in lieu of reinstatement, award front pay in an amount to be determined at trial;

4)      Award Plaintiff back pay, representing lost wages and salary;

5)      Award Plaintiff compensatory damages for lost benefits, including:

      a)      Tuition remission benefits of $28,500;

      b)      Health insurance benefits of $9,403.92;

      c)      Dental insurance benefits of $792.28;

      d)      Vision insurance benefits of $148.41.

6)      Award Plaintiff back pay, representing no less than $3,333.33 in lost wages, and an equal portion as liquidated damages;

7)      Award Plaintiff compensatory damages for emotional distress, mental anguish, and psychological harm;

8)      Award Plaintiff punitive damages in an amount to be determined at trial;

9)      Award Plaintiff reasonable attorneys' fees and costs, and continuing to accrue;

10)     Award Plaintiff pre-judgment and post-judgment interest as provided by law;

11)     Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: July 11, 2025

Respectfully Submitted,
*/s/ Francisco E. Mundaca*
Francisco E. Mundaca, Esq.
(Bar No. 21701)
fmundaca@mundacalaw.com

*/s/ Zachary S. Aman*
Zachary S. Aman, Esq.
(Bar No. 31628)
zaman@mundacalaw.com

THE MUNDACA LAW FIRM, LLC
1997 Annapolis Exchange Parkway, Suite 300
Annapolis, MD 21401
Phone: (202) 474-8500
Fax: (240) 233-8626